# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| MATTHEW KRAMER, | ) | |
|   Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:17cv00025 |
| | ) | |
| NANCY A. BERRYHILL, | ) | **MEMORANDUM OPINION** |
|   Acting Commissioner of | ) | |
|   Social Security, | ) | |
|   Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Matthew Kramer, ("Kramer"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011 & Supp. 2018). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kramer protectively filed an application for DIB on April 9, 2013, alleging disability as of November 29, 2012, based on a shattered right calcaneus, a compression fracture of the L1-L2 level of the lumbar spine and an inability to walk unassisted. (Record, ("R."), at 189-90, 199, 203.) The claim was denied initially and upon reconsideration. (R. at 107-09, 113-15, 118-21, 123-25.) Kramer then requested a hearing before an administrative law judge, ("ALJ"). (R. at 126.) A video hearing was held on August 11, 2016, at which Kramer was represented by counsel. (R. at 31-77.)

By decision dated September 26, 2016, the ALJ denied Kramer's claim. (R. at 16-26.) The ALJ found that Kramer met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2013. (R. at 18.) The ALJ also found that Kramer had not engaged in substantial gainful activity since November 29, 2012, the alleged onset date.[1] (R. at 18.) The ALJ found that, through the date last insured, the medical evidence established that Kramer suffered from severe impairments, namely status-post calcaneus fracture; degenerative disc disease; status-post burst fracture corrected by kyphoplasty; osteopenia; and pulmonary emphysema, but he found that Kramer did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that, through the date last insured, Kramer had the residual functional capacity to

---

[1] Therefore, Kramer must show that he was disabled between November 29, 2012, the alleged onset date, and June 30, 2013, the date last insured, in order to be entitled to benefits.

perform light work[2] except that he was able to stand and/or walk for only four hours in an eight-hour workday; frequently balance; occasionally crawl, crouch, kneel, stoop and climb ramps and stairs; and never climb ladders, ropes or scaffolds or work around respiratory irritants. (R. at 19.) The ALJ found that, through the date last insured, Kramer was unable to perform his past relevant work. (R. at 24.) Based on Kramer's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that, through the date last insured, jobs existed in significant numbers in the national economy that Kramer could perform, including jobs as an assembler, a packer and an inspector, tester and sorter.[3] (R. at 24-25.) Thus, the ALJ found that, through the date last insured, Kramer was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 25-26.) *See* 20 C.F.R. § 404.1520(g) (2017).

After the ALJ issued his decision, Kramer pursued his administrative appeals, (R. at 12, 187), but the Appeals Council denied his request for review. (R. at 1-4.) Kramer then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2017). The case is before this court on Kramer's motion for summary judgment filed December 27, 2017, and the Commissioner's motion for summary judgment filed February 26, 2018.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2017).

[3] Although the ALJ found that Kramer could perform a range of light work, he found that Kramer could perform the sedentary jobs identified by the vocational expert. (R. at 19, 25, 71-72.)

*II. Facts*

Kramer was born in 1978, (R. at 37, 189), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a tenth-grade education and past relevant work experience as a loader/warehouse worker and a roofer. (R. at 37-38, 69-70, 204.) Kramer stated that he could sit for up to 90 minutes without interruption and stand for up to 30 minutes on his left foot without interruption and up to 25 minutes on his right foot. (R. at 44.) He stated that he had to lie down up to two hours in an eight-hour workday due to pain. (R. at 47.) Kramer stated that he played on a dart team once a week. (R. at 61-62.)

John Newman, a vocational expert, also was present and testified at Kramer's hearing. (R. at 68-75.) He was asked to consider a hypothetical individual of Kramer's age, education and work history, who had the residual functional capacity to perform light work; who could stand and/or walk up to four hours in an eight-hour workday; who could frequently balance; occasionally crawl, crouch, kneel, stoop and climb ramps and stairs; and who could not climb ropes, ladders or scaffolds. (R. at 70-71.) Newman stated that such an individual could not perform Kramer's past work, but that a significant number of sedentary[4] jobs existed in the national economy that such an individual could perform, including jobs as an assembler, a packer, a stuffer, an inspector, a tester and a gauger. (R. at 71-72.) Newman further testified that the same hypothetical individual, but who would need to avoid exposure to respiratory irritants, could perform the previously identified jobs. (R. at 72.) Newman also was asked to consider a hypothetical

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2017).

individual who had the residual functional capacity to perform simple, routine, sedentary work; who could occasionally climb ramps and stairs; never balance, crawl, crouch, kneel, stoop or climb ladders, ropes or scaffolds; who could not be exposed to respiratory irritants; and who could have no more than occasional contact with the general public. (R. at 72.) He stated that, the prohibition on stooping "associated with crouching and the other activities," would eliminate any jobs. (R. at 72.)

Newman was then asked to consider the second hypothetical individual, but who could have no more than occasional contact with the general public and who would be limited to simple, routine work tasks. (R. at 72-73.) He stated that the individual could perform the jobs previously identified. (R. at 73.) Newman was then asked to consider the first hypothetical individual, but who would need a sit/stand option every 15 to 20 minutes, and, with every other rotation, the individual would need to be allowed to walk around. (R. at 73.) He stated that there would be no jobs available that such an individual could perform. (R. at 74.) Newman also stated that there would be no jobs available should the individual need additional breaks beyond the standard breaks, would be absent more than two days a month or would be off task 10 to 15 percent of the day. (R. at 74-75.)

In rendering his decision, the ALJ reviewed medical records from Dr. Carolina Bacani-Longa, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Holston Valley Medical Center, ("Holston Valley"); Indian Path Medical Center, ("Indian Path"); Associated Orthopaedics of Kingsport; Dr. Larry Hartman, M.D., a neurosurgeon; Pain Medicine Associates, P.C.; Dr. Sung-Joon Cho, M.D.; Simpson Clinic, L.L.C.; and Kingsport Primary Care.

On July 23, 2012, Kramer presented to the emergency room at Holston Valley for complaints of a work-related low back injury. (R. at 391-96.) He was diagnosed with a back injury and sciatica. (R. at 391.) On July 26, 2012, Kramer again presented to the emergency room at Holston Valley for continued complaints of back pain. (R. at 381-90.) A CT scan of Kramer's lumbar spine showed posterior disc protrusions at the L3-L4 and L4-L5 levels. (R. at 390.) X-rays of Kramer's pelvis were normal. (R. at 389.) Kramer was diagnosed with low back pain, sciatica and intervertebral disc prolapse. (R. at 383.) On November 29, 2012, Kramer was admitted to Holston Valley after falling from a roof and landing on his right foot and back. (R. at 303-80.) He sustained a right calcaneal fracture; a small avulsion fracture of the fibula; a small avulsion fracture of the dorsum of the talus; and a compression fracture of the L1-L2 vertebrae. (R. at 303, 368-70, 372, 374, 439-40.) A CT scan of Kramer's thoracic spine showed mild generalized spondylosis. (R. at 373.) X-rays of Kramers's lungs were normal. (R. at 376.) Kramer underwent kyphoplasty surgery of the L1 and L2 vertebrae. (R. at 303, 312-13, 416-17.) On December 2, 2012, a chest x-ray showed mediastinal[5] and bilateral hilar[6] lymphadenopathy,[7] pulmonary emphysema and bibasilar subsegmental atelectasis.[8] (R. at 378-79.) He was discharged in good condition on

---

[5] Mediastinal or mediastinum is defined as a septum between two parts of an organ or a cavity. It is the region in mammals between the pleural sacs, containing the heart and all of the thoracic viscera except the lungs. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 497 (1995).

[6] Hilar relates to the hilum, which is a depression or slit-like opening through which nerves, ducts or blood vessels enter and leave in an organ or a gland. Also called porta. *See* Stedman's at 373.

[7] Lymphadenopathy is defined as a chronic, abnormal enlargement of the lymph nodes, usually associated with disease. *See* Stedman's at 478.

[8] Atelectasis is a complete or partial collapse of a lung or lobe of a lung that develops when the alveoli within the lung become deflated. It is a breathing complication after surgery. *See* https://www.mayoclinic.org/diseases-conditions/atelectasis/symptoms-causes/syc-20369684

December 6, 2012. (R. at 303.) On December 18, 2012, Kramer was admitted to Indian Path for internal fixation of a right calcaneal fracture.[9] (R. at 403-09, 426-29.)

On December 26, 2012, Dr. Larry Hartman, M.D., a neurosurgeon, saw Kramer as a follow up to his kyphoplasty surgery. (R. at 414.) Dr. Hartman reported that Kramer had limited range of motion of his lumbar spine, secondary to muscular tightness; his deep tendon reflexes were intact and symmetric; motor strength was normal; sensory examination was intact and symmetric; and straight leg raising tests were negative bilaterally. (R. at 414.) Dr. Hartman noted that Kramer was doing well and that he did not need further neurosurgical intervention.[10] (R. at 414.) Kramer was advised to increase his activities as tolerated. (R. at 414.) Dr. Hartman noted that Kramer was a roofer, and, therefore, was unable to work at that time. (R. at 414.)

On December 27, 2012, Dr. Jeansonne reported that Kramer's incision site was well-healed, and Kramer was placed in a controlled ankle movement, ("CAM"), walker boot. (R. at 437.) On January 23, 2013, Dr. Jeansonne noted that Kramer began to regain right ankle range of motion. (R. at 435.) In February 2013, x-rays of Kramer's right ankle showed good maintenance of fracture fragment position and no evidence of hardware loosening. (R. at 434.) It was noted that Kramer's mother reported that Kramer did not always use his prescribed CAM walker boot and walker as instructed. (R. at 433.) In March 2013, x-rays of

---

(last visited Aug. 13, 2018).

[9] Post-operatively, Kramer attended routine follow-up visits with Dr. Gregory E. Jeansonne, M.D., a physician with Associated Orthopaedics of Kingsport. (R. at 430-38.)

[10] There is no indication that Kramer sought medical care for his back-related issues through June 30, 2013, his date last insured.

Kramer's right ankle showed excellent maintenance of fracture fragment position and no evidence of hardware loosening. (R. at 431.) Dr. Jeansonne advised Kramer that he could bear weight as tolerated while using his CAM walker boot. (R. at 431.) In April 2013, x-rays of Kramer's right foot showed osteopenia in his right foot due to lack of use. (R. at 430.) Dr. Jeansonne advised Kramer to put more weight on his foot while using the CAM walker boot for support; to no longer use the crutches for weight bearing; and to perform ankle and forefoot range of motion exercises as aggressively as tolerated. (R. at 430.) In May 2013, Kramer had minimal tenderness and swelling; no pain with somewhat limited ankle dorsiflexion and plantarflexion; and moderate pain with hind foot inversion. (R. at 425.) X-rays of Kramer's right foot showed good consolidation within the calcaneus fracture and some reversal of his disuse osteopenia. (R. at 425.) Dr. Jeansonne released Kramer from the CAM walker boot and advised him that he would see him on an as-needed basis. (R. at 425.)

On November 30, 2013, Dr. Sung-Joon Cho, M.D., examined Kramer at the request of Disability Determination Services. (R. at 452-55.) Kramer reported that his pain was "simplified" with Advil. (R. at 452.) Kramer reported that he could stand for up to 15 minutes without interruption and walk about 50 yards. (R. at 452.) He stated that he had recovered from his back injury and that it was not as debilitating as his calcaneal fracture. (R. at 452-53.) Kramer walked with an antalgic gait without any assistive devices; his gait speed was normal; he had decreased stance phase on his affected right heel; his right leg was "a bit" abducted to the right; he had difficulty walking on his forefoot on his right leg; he could squat, but his weight was shifted onto his left side/leg; straight leg raising tests were negative bilaterally; he had full motor function throughout; he had limited range of motion of the right ankle; he had no inversion and eversion of the right

ankle; his ankle dorsiflexion, plantar flexion and lumbar flexion were limited on the right ankle; and he had tenderness around the lateral side of the left ankle. (R. at 454.) X-rays of Kramer's right foot showed a healed calcaneus fracture and diffuse heterogeneous osteopenia. (R. at 451.) Dr. Cho diagnosed history of calcaneal fracture, status-post open reduction and internal fixation with resultant gait dysfunction and antalgia and history of lumbar compression fractures. (R. at 454.) Dr. Cho opined that Kramer could stand and/or walk two to three hours; he had no limit on his ability to sit; he could occasionally lift and carry items weighing up to 20 pounds and 10 pounds frequently; he could not climb, balance, stoop, kneel, crouch and crawl; and no manipulative or environmental limitations were noted. (R. at 455.)

On December 26, 2013, Dr. Carolina Bacani-Longa, M.D., a state agency physician, found that Kramer had the residual functional capacity to perform light work. (R. at 84-86.) She found that Kramer could stand and/or walk up to four hours in an eight-hour workday and sit up to six hours in an eight-hour workday. (R. at 85.) Dr. Bacani-Longa found that Kramer could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 85.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 85.)

On August 12, 2014, Dr. Robert McGuffin, M.D., a state agency physician, found that Kramer had the residual functional capacity to perform light work. (R. at 98-99.) He found that Kramer could stand and/or walk up to four hours in an eight-hour workday and sit up to six hours in an eight-hour workday. (R. at 98.) Dr. McGuffin found that Kramer could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or

scaffolds. (R. at 98-99.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 99.)

The record shows that Kramer participated in pain management treatment for back pain and right lower extremity pain at the Simpson Clinic, L.L.C., from December 2014 through July 2016. (R. at 466-511, 518-37, 542-47, 554-604, 608-57, 673-79.) During this time, Kramer reported that his pain medication relieved his pain enough to make a real difference in his life. (R. at 477, 495, 507, 624, 631, 645, 743, 748.) While Kramer reported pain with walking, and it was noted that he walked with a limp, he repeatedly reported that he received adequate pain relief from his medications.[11] (R. at 480, 488, 524, 534, 741.) Kramer routinely noted that his physical functioning, mood, sleep patterns and overall functioning were better since taking his medications. (R. at 477, 485, 495, 507, 531, 547, 624, 631, 645, 743, 748.)

On April 1, 2015, Kramer was seen by Dr. Ardel Gorospe, M.D., a physician at Kingsport Primary Care, to establish pain management treatment. (R. at 660-62, 670-72.) Kramer reported that he had been discharged from the Simpson Clinic because his urine screen was negative for oxycodone.[12] (R. at 670.) Kramer stated that his pain was adequately controlled with less pain medication. (R. at 670.) Kramer's judgment and insight were intact, and he had a normal mood and affect. (R. at 671.)

On June 19, 2015, Shannon Hollowell, F.N.P., a family nurse practitioner

---

[11] It was noted on two occasions that Kramer's medication count showed pill shortages. (R. at 502, 564.)

[12] Kramer stated that he was prescribed 120 tablets per month. (R. at 670.)

with Pain Medicine Associates, P.C., saw Kramer for complaints of right foot pain. (R. at 463-64.) Kramer stated that he received pain medication from the Simpson Clinic, but he was no longer being treated there because they no longer accepted his insurance.[13] (R. at 463.) He also stated that his primary care physician would not prescribe pain medications. (R. at 463.) Hollowell noted that Kramer could stand from a seated position with mild difficulty; his gait was antalgic to the right; abnormal sensation affected the right ankle and foot; pedal pulses were palpable; and his foot was red in appearance and warm to the touch. (R. at 464.) Hollowell diagnosed status-post right calaneus fracture with surgical repair; L1 compression fracture status-post kyphoplasty; and right ankle pain. (R. at 464.)

On August 7, 2015, Kramer complained of back pain and right ankle pain. (R. at 461.) He stated that he felt like the hardware in his ankle had shifted, causing his foot pain to worsen. (R. at 461.) Dr. Sameh A. Ward, M.D., a physician with Pain Medicine Associates, P.C., reported that Kramer could stand from a seated position with no distress; he walked with no antalgia; he had good motor power over the lower extremities; he had point tenderness over the L3-L5 facets, bilaterally; flexion and extension of the trunk caused concordant pain; he had good motor power over the lower extremities; he had decreased sensation over the three-quarter distribution on the right; the right ankle was not swollen; and he was able to walk on his right foot. (R. at 461.) Dr. Ward noted that Kramer tried to manipulate him by reporting that ibuprofen caused his irritable bowel syndrome to worsen. (R. at 462.) Dr. Ward advised Kramer that he did not see any indication for him to be on opioid medication; therefore, he would not prescribe opioid treatment. (R. at 461-62.) Dr. Ward diagnosed lumbar facet osteoarthritis; status-post compression fracture of the L1-L2 level; status-post hardware repair of

---

[13] Kramer reported this again on August 7, 2015. (R. at 461.)

calcaneal fracture, right ankle; medication issues in the past; possible irritable bowel syndrome; and chronic anxiety and depression. (R. at 461.)

In September 2015, Dr. Simpson reported that Kramer had tenderness to palpation in the lumbar spine and some sensory loss in his right toes, but he was able to flex and extend his right toes. (R. at 554.) In September 2015, Kramer reported to Dr. Gorospe that his symptoms of depression were stable on medication. (R. at 668.) Dr. Gorospe noted that Kramer's neurological and musculoskeletal examinations were stable. (R. at 669.)

In May 2016, Kramer reported to Dr. Simpson that he was able to do his activities of daily living and that he worked on a farm. (R. at 638.) He reported that Lyrica helped with his pain. (R. at 638.) In June 2016, Kramer tested positive for morphine. (R. at 626, 646, 648.) Kramer stated that he took morphine from a friend while he was at a dart tournament. (R. at 626.) In July 2016, Kramer reported that he was very depressed after discontinuing his antidepressant medication. (R. at 619.) Kramer reported bilateral hip pain and requested a "long acting narcotic." (R. at 619.) Kramer had full range of motion in both hips and no pain with rotation of the hips. (R. at 619.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2017); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a

listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2017).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Kramer argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-8). Specifically, Kramer argues that the ALJ erred by failing to explain how he determined that Kramer's impairments did not satisfy the criteria of § 1.02, the listing for major dysfunction of a joint, and § 1.04, the listing for disorders of the spine. (Plaintiff's Brief at 12-16.) Kramer also argues that the ALJ erred by failing to properly evaluate the opinion of Dr. Cho and by giving controlling weight to the opinions of the state agency physicians. (Plaintiff's Brief at 9-12.)

After a review of the evidence of record, I find Kramer's arguments unpersuasive. Step three of the sequential evaluation requires the ALJ to determine

whether Kramer has an impairment that meets or equals the criteria of a listed impairment. The burden of making such a showing rests with the claimant. *See Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012)). It is well-settled that, in order "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

The ALJ found that Kramer's impairments did not meet or equal the criteria of § 1.02, the listing for major dysfunction of a joint, and § 1.04, the listing for disorders of the spine. (R. at 19.) To meet or equal the listing of § 1.02, a claimant must have major joint dysfunction characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint. With:

> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;[14] or
>
> B. Involvement of one major peripheral joint in each upper

---

[14] "Inability to ambulate effectively" is defined in 1.00B2b(1) as, "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1) (2017).

> extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02 (2017).

The ALJ noted that the record failed to show that Kramer exhibited an inability to ambulate effectively as defined in the listings or that he was unable to perform fine and gross movements effectively. (R. at 19.) As noted by the ALJ, the record shows that three months following Kramer's surgery, Kramer was not using his prescribed equipment as instructed, (R. at 433); in March 2013, Kramer could bear weight as tolerated while using his CAM walker boot, (R. at 431); in April 2013, Dr. Hartman advised Kramer that he needed to put more weight on his right foot and to stop using crutches for weight bearing, (R. at 430); in May 2013, Kramer was walking without the CAM walker boot and was released from care, (R. at 425); and in November 2013, Kramer walked with an antalgic gait, but did not use an assistive device, and he maintained normal gait speed and performed activities of daily living independently. (R. at 452, 454.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Kramer's impairments did not meet or equal the criteria of § 1.02, the listing for major dysfunction of a joint.

Section 1.04 requires that a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord with either (A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test; or (B) spinal

arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00B2b. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2017). For a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (emphasis in original). For the following reasons, I find that substantial evidence supports the ALJ's finding that Kramer's back impairment does not meet or equal the requirements of § 1.04(A).

The ALJ noted that the objective medical evidence showed that Kramer's back surgery was successful. (R. at 23.) Three weeks following his surgery, Kramer exhibited a limited back range of motion, secondary to muscular tightness, along with normal motor strength, intact sensation and normal deep tendon reflexes. (R. at 414.) Dr. Hartman noted that Kramer was doing well and released him from care in December 2012. (R. at 414.) In addition, in November 2013, Dr. Cho reported that Kramer's "back pain [d]oes not cause major disability. He has mainly recovered from that." (R. at 452.) Dr. Cho noted that Kramer had full motor function throughout, and straight leg raising tests were negative. (R. at 454.) In addition, Drs. Bacani-Longa and McGuffin opined that Kramer's impairments did not meet or equal a listed impairment. (R. at 84-86, 98-99.)

Kramer also argues that the ALJ erred by failing to properly evaluate the opinion of Dr. Cho and by giving controlling weight to the opinions of the state agency physicians. (Plaintiff's Brief at 9-12.) Based on my review of the record, I find this argument unpersuasive. While the ALJ, in general, is required to give more weight to opinion evidence from examining sources versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a consultative examiner. *See* 20 C.F.R. § 404.1527(c) (2017). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

The ALJ noted that he was giving Dr. Cho's opinion "little weight" because his opinion "overstates" Kramer's limitations. (R. at 22.) The ALJ noted that Dr. Cho's opinion was inconsistent with Kramer's treatment notes from the period through his date last insured. (R. at 22-23.) The ALJ noted that the objective medical evidence showed that Kramer's back healed well after surgery. (R. at 23.) Three weeks following surgery, Kramer exhibited some paraspinal tenderness and mildly limited back range of motion, but he had normal motor strength, intact sensation and normal deep tendon reflexes. (R. at 20, 23, 414.) Kramer's surgeon released him from care in December 2012. (R. at 414.) In fact, Dr. Cho reported in November 2013, that Kramer's "back pain [d]oes not cause major disability. He has mainly recovered from that." (R. at 452.) With regard to Kramer's injury to his heel, the ALJ noted that Kramer's treating surgeon, Dr. Jeansonne, released Kramer from his care in May 2013 to follow up only as needed. Dr. Jeansonne did not place any restrictions on Kramer's work-related activities at that time. Furthermore, Kramer did not seek any additional medical treatment for either his back or heel prior to his date last insured. In addition, Kramer reported that his pain

was controlled with ibuprofen. (R. at 452.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Based on this, I find that substantial evidence exists to support the ALJ's weighing of the evidence with regard to Kramer's residual functional capacity.

Based on the above, I find that substantial evidence exists in the record to support the ALJ's finding that Kramer was not disabled. An appropriate Order and Judgment will be entered.

DATED: August 14, 2018.

          s/ *Pamela Meade Sargent*
          UNITED STATES MAGISTRATE JUDGE